United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 5, 2000 Decided December 15, 2000 

 No. 99-1325

 National Lime Association, 
 Petitioner

 v.

 Environmental Protection Agency, 
 Respondent

 Consolidated with 
 99-1326

 On Petitions for Review of An Order of the 
 Environmental Protection Agency

 Hunter L. Prillaman argued the cause for petitioner Na-
tional Lime Association. With him on the briefs were Arline 
M. Seeger and Kenneth A. Rubin.

 James S. Pew argued the cause for petitioner Sierra Club. 
With him on the briefs was Howard I. Fox.

 Daniel M. Flores, Attorney, U.S. Department of Justice, 
argued the cause for respondent. With him on the brief were 
Lois J. Schiffer, Assistant Attorney General, Daniel R. Dert-
ke, Attorney, and Steven E. Silverman, Attorney, Environ-
mental Protection Agency. Christopher S. Vaden and H. 
Michael Semler, Attorneys, U.S. Department of Justice, en-
tered appearances.

 William M. Bumpers was on the brief for amicus curiae 
the American Portland Cement Alliance.

 Before: Edwards, Chief Judge, Ginsburg and Tatel, 
Circuit Judges.

 Opinion for the Court filed by Circuit Judges Ginsburg and 
Tatel.*

 Ginsburg and Tatel, Circuit Judges: In this case we 
consider petitions by the Sierra Club and the National Lime 
Association challenging the Environmental Protection Agen-
cy's hazardous air pollutant emission regulations for cement 
manufacturing. With respect to the Sierra Club petition we 
(1) reject its challenge to the emission standards for hazard-
ous metals and dioxin/furan; (2) find the Agency's failure to 
set standards for hydrogen chloride, mercury, and total hy-
drocarbons contrary to the Clean Air Act's plain language; 
(3) direct EPA to consider the health impacts of potentially 
stricter standards for hazardous metals; and (4) sustain the 
regulation's monitoring requirements. Concluding that the 
National Lime Association has associational standing, we (1) 
reject its argument that EPA's use of particulate matter as a 
surrogate for non-volatile metal hazardous air pollutants vio-
lates the Clean Air Act and is arbitrary and capricious; and 
(2) reject its challenge to the testing method EPA adopted for 
determining whether a manufacturer qualifies as a "major 
source" of hazardous air pollutants.

__________
 * Judge Tatel wrote Sections I and II. Judge Ginsburg wrote 
Sections III and IV.

 I. Background

 The Clean Air Act requires the Environmental Protection 
Agency to establish emission standards for "major sources" of 
hazardous air pollutants listed in the statute. 42 U.S.C. 
s 7412(d)(1). The Act directs the Agency to review the list 
periodically, and, where appropriate, to revise it by rule. Id. 
s 7412(b)(2). Hazardous air pollutants are known as HAPs.

 A "major source" is any stationary source that emits ten 
tons per year or more of any single HAP or twenty-five 
tons per year or more of any combination of HAPs. Id. 
s 7412(a)(1). Under section 7412(d)(2) of the statute, emis-
sion standards must require

 the maximum degree of reduction in emissions [of HAPs] 
 ... that the Administrator, taking into consideration the 
 cost of achieving such emission reduction, and any non-
 air quality health and environmental impacts and energy 
 requirements, determines is achievable ... through ap-
 plication of measures, processes, methods, systems or 
 techniques including, but not limited to, ... process 
 changes, substitution of materials or other modifications.
 
In addition to this general guidance, the statute includes 
minimum stringency requirements for emission standards 
that apply without regard to either costs or the other factors 
and methods listed in section 7412(d)(2). These stringency 
requirements differ depending on whether a source is "new" 
or "existing." New sources are defined as "stationary 
source[s], the construction or modification of which is com-
menced after the publication of regulations (or, if earlier, 
proposed regulations) prescribing" air pollution standards 
that will be applicable to such sources. Id. s 7411(a)(2). For 
new sources, the statute provides that "[t]he maximum de-
gree of reduction in emissions that is deemed achievable for 
new sources ... shall not be less stringent than the emission 
control that is achieved in practice by the best controlled 
similar source, as determined by the Administrator." Id. 
s 7412(d)(3) (emphasis added). For existing sources, defined 
as all stationary sources other than new sources, id. 

s 7411(a)(6), the statute provides that standards shall not be 
less stringent than "the average emission limitation achieved 
by the best performing 12 percent of the existing sources (for 
which the Administrator has emissions information)." Id. 
s 7412(d)(3)(A).

 EPA implements these statutory requirements through a 
two-step process. The Agency begins by setting the mini-
mum stringency standards required by section 7412(d)(3) for 
new and existing sources. Adding confusion to this already 
complex statute, EPA calls these minimum stringency re-
quirements "floors," even though they in fact establish maxi-
mum emission levels. See Sierra Club v. EPA, 167 F.3d 658, 
660 (D.C. Cir. 1999) ("Sierra"). Once the Agency sets statu-
tory floors, it then determines, considering cost and the other 
factors listed in section 7412(d)(2), whether stricter standards 
are "achievable." 42 U.S.C. s 7412(d)(2). The Agency calls 
such stricter requirements "beyond-the-floor" standards.

 This case concerns emission standards for portland cement 
manufacturing plants. See National Emission Standards for 
Hazardous Air Pollutants from the Portland Cement Manu-
facturing Industry, 40 C.F.R. ss 63.1340-.1359. Patented in 
1824 by Joseph Aspdin and named for its resemblance to 
portland stone, limestone from the Isle of Portland, see 9 The 
New Encyclopedia Britannica 629 (15th ed. 1998), portland 
cement is a fine powder that serves as the key ingredient in 
the concrete used in most construction. See National Emis-
sion Standards for Hazardous Air Pollutants; Proposed Stan-
dards for Hazardous Air Pollutants Emissions for the Port-
land Cement Manufacturing Industry, 63 Fed. Reg. 14,182, 
14,185 (Mar. 24, 1998). The cement manufacturing process 
begins by grinding together materials such as limestone, clay, 
shale, sand, iron ore, and flyash and heating the mixture in a 
kiln. See 40 C.F.R. s 63.1341; 63 Fed. Reg. at 14,194. 
Known as "clinker," the heated mixture is then cooled in a 
"clinker cooler" and ground to a fine powder in a mill. See 40 
C.F.R. s 63.1341.

 Prior to setting cement manufacturing emission standards, 
EPA estimated that portland cement plants throughout the 
country emitted a total of 290 tons of HAPs per year. 63 
Fed. Reg. at 14,183. EPA found that most individual cement 
plants released over ten tons of hydrogen chloride ("HCl") 
annually, qualifying them as major sources of HAPs for which 
the Clean Air Act required the Agency to set emission 
standards. See id. at 14,192-93. In addition to HCl, EPA 
found that cement plants emitted significant levels of HAP 
metals, dioxin/furan, mercury, and organic HAPs other than 
dioxin/furan. See id. at 14,195-96. These HAPs were re-
leased by kilns, clinker coolers, and mills, as well as by 
storage and transportation of materials within cement plants. 
See id. at 14,183. According to EPA, the potential health 
effects of these pollutants include inflammation of the respira-
tory tract, reproductive problems, cancer, nausea, blood disor-
ders, and damage to the immune system. See id. at 14,184.

 Acting on this information, EPA began by considering 
emission "floors" for each of the five major categories of 
HAPs released by cement plants. For dioxin/furan, the 
Agency set emission floors for both new and existing sources. 
Considering particulate matter ("PM") to be an appropriate 
surrogate for non-volatile HAP metals--components of PM 
that are difficult to measure directly--EPA established emis-
sion floors for new and existing sources for PM as well. EPA 
set no floors--referred to as floors of "no control"--for the 
three remaining HAPs, HCl, mercury, and organic HAPs 
other than dioxin/furan.

 The Agency took a technology-based approach to setting 
emission floors. For cement plants qualifying as new 
sources, EPA identified the emission control technology used 
by the best performing plant for which it had information and 
called this the MACT floor technology. MACT means "maxi-
mum achievable control technology." EPA then looked at 
emissions data for all plants using the MACT floor technology 
for which it had information, not just data from the best 
performing plant, and set the new source emission floor at the 
highest emission level reported by a plant using that technol-
ogy. To set existing source emission floors, EPA followed a 

similar procedure. It identified the technology used by the 
median plant out of the best twelve percent of plants for 
which it had information and set the existing source emission 
floor at the emission level of the worst performing plant in its 
database using that technology. If, as in the case of HCl, 
mercury, and organic HAPs other than dioxin/furan, EPA 
found an insufficient number of plants in its database (one for 
new sources or twelve percent for existing sources) control-
ling a particular HAP with pollution control technology, it set 
no standard at all, i.e., it determined that the emission floor 
was "no control."

 Proceeding to the next stage of the emission standard 
setting process, EPA declined (with one exception not rele-
vant to this case) to set beyond-the-floor standards for either 
new or existing sources for any of the five HAPs.

 In addition to requiring EPA to set emission standards, the 
Clean Air Act directs the Agency to require owners and 
operators of major sources to conduct "enhanced monitoring" 
of their emissions and to submit "compliance certifications" 
reporting compliance with the emission standards. 42 U.S.C. 
s 7414(a)(3). Acting pursuant to this requirement, EPA di-
rected cement plants to use a technique known as Fourier 
transform infrared spectroscopy ("FTIR") to measure their 
HCl emissions to determine whether they qualify as major 
sources. See 40 C.F.R. s 63.1352(a); id. pt. 63, app. A. 
Plants qualifying as major sources must conduct performance 
tests that measure PM emissions every five years. See id. 
s 63.1349(b)(1), (c). To test for compliance with PM stan-
dards between performance tests, cement plants must moni-
tor opacity either with a continuous opacity monitor or 
through visual inspections. See id. s 63.1350(c). Cement 
plants must also develop site-specific operations and mainte-
nance plans to be submitted to EPA for approval as part of 
the permitting process. See id. s 63.1350(a).

 Petitioners Sierra Club and National Lime Association 
("NLA") challenge these regulations. The Sierra Club 
mounts four specific challenges: (1) EPA's approach to set-

ting emission floors for PM and dioxin/furan both violates the 
Clean Air Act and is arbitrary and capricious; (2) the Agen-
cy's refusal to set standards for HCl, mercury, and total 
hydrocarbons violates the statute; (3) EPA's rejection of 
beyond-the-floor standards for mercury, total hydrocarbons, 
and HAP metals (for which PM is a surrogate) is arbitrary 
and capricious; and (4) the monitoring requirements fail to 
provide adequate assurance of compliance with the PM stan-
dard. NLA, a trade association representing lime manufac-
turers, some of which also manufacture cement, argues that 
(1) EPA's decision to use PM as a surrogate for HAP metals 
violates the statute and is arbitrary and capricious; and (2) 
the Agency's decision to require cement plants to use the 
FTIR method to determine their major source status is 
arbitrary and capricious. The American Portland Cement 
Alliance, a trade association representing cement manufactur-
ers and marketers, intervenes in support of EPA. We con-
sider the Sierra Club's challenges in Section II and NLA's in 
Section III.

 II. Sierra Club Petition

A. PM and Dioxin/Furan Floors

 Relying on Chevron U.S.A. Inc. v. Natural Resources 
Defense Council, Inc., 467 U.S. 837, 842-43 (1984) (establish-
ing that when Congress's intent is clear, "that is the end of 
the matter; for the court, as well as the agency, must give 
effect to the unambiguously expressed intent of Congress"), 
the Sierra Club argues that the Agency's technology-based 
approach conflicts with the Clean Air Act's plain language. 
According to the Sierra Club, section 7412(d)(3) requires EPA 
to set new source floors at the lowest recorded emission level 
for which it has data and existing source floors at the average 
of the lowest twelve percent of recorded emission levels for 
which it has data. Nothing in the statute, the Sierra Club 
argues, permits the Agency to set floors based on the perfor-
mance of technology as opposed to the recorded performance 
of plants.

 In resolving this issue, we do not write on a clean slate. 
EPA's technology-based approach to setting new source emis-

sion standards has already faced and survived a Chevron one 
challenge. In Sierra, 167 F.3d 658, we reviewed a new source 
emission standard for solid waste combustion that EPA pro-
mulgated pursuant to section 7429, which establishes emission 
requirements virtually identical to section 7412's. There, as 
here, the Sierra Club argued that EPA's MACT technology 
approach to setting emission standards is unambiguously 
forbidden by the Clean Air Act. Sierra rejected that argu-
ment, holding that EPA may estimate the performance of the 
best performing units and that it was not "impossible" that 
EPA's methodology constituted a reasonable estimation tech-
nique. See 167 F.3d at 665. Concluding that EPA could 
reasonably interpret the statutory phrase "emissions control 
that is achieved in practice" to mean emissions control that is 
"achieved under the worst foreseeable circumstances," see id. 
(citing National Lime Ass'n v. EPA, 627 F.2d 416, 431 n.46 
(D.C. Cir. 1980)), we hypothesized: "perhaps considering all 
units with the same technology is justifiable because the best 
way to predict the worst reasonably foreseeable performance 
of the best unit with the available data is to look at other 
units' performance." Id. at 665. But because EPA failed to 
explain why it adopted the MACT approach, we remanded to 
the Agency for further explanation, thus never needing to 
determine whether the MACT approach would have survived 
petitioners' Chevron two or arbitrary and capriciousness chal-
lenges.

 EPA has now explained why it adopted the MACT ap-
proach. In the announcement of the regulations challenged 
in this case, the Agency, citing Sierra, explains (1) that it 
must ensure that emission "standards are achievable 'under 
[the] most adverse circumstances which can reasonably be 
expected to recur,' " 64 Fed. Reg. 31,898, 31,915 (June 14, 
1999) (quoting Sierra, 167 F.3d at 665), and (2) that "evaluat-
ing how a given MACT technology performs is a permissible 
means" of estimating the actual performance of the top 
twelve percent of plants. Id. EPA explains further that the 
emission standards it set "are based on the emission levels 
achieved through the application of MACT floor technologies 

and account for variation in the process and in the air 
pollution control device effectiveness." Id. at 31,916.

 The Sierra Club does not challenge EPA's extension of 
Sierra to existing source standards. Instead, it argues that 
Sierra's Chevron one analysis does not control this case 
because section 7412 (at issue here) differs from section 7429 
(at issue in Sierra). Although the two sections contain identi-
cal stringency requirements for new sources, section 7412, the 
Sierra Club emphasizes, directs the Agency to base emission 
standards for existing sources on those plants "for which the 
Administrator has emissions information," 42 U.S.C. 
s 7412(d)(3)(A), a limitation appearing nowhere in section 
7429. See id. s 7429(a)(2). According to the Sierra Club, 
section 7412's additional limitation implies that EPA must 
directly calculate the average of the best twelve percent from 
the data it has, thus precluding the Agency from estimating 
emissions based on the use of MACT technology.

 We do not agree that the difference between the two 
sections requires a different result in this case. Section 
7412's additional phrase says nothing about what data the 
Agency should use to calculate emission standards. It says 
only that standards must be based on the best performing 
"sources (for which the Administrator has emissions informa-
tion)." 42 U.S.C. s 7412(d)(3)(A). Following this directive, 
EPA set standards for PM and dioxin/furan at the average 
emission levels it estimated the best 12 percent (for which it 
had information) achieved. In doing so, the Agency simply 
did not limit itself to consideration of data from the best 
twelve percent of plants; instead it used data it had from 
other plants that use the same technology as the best twelve 
percent to estimate the performance of the best twelve per-
cent. Sierra found this approach not unambiguously forbid-
den by the statute. See 167 F.3d at 665.

 Thus bound by Sierra's Chevron one analysis, we turn to 
the Sierra Club's argument that the MACT approach is both 
unreasonable, see Chevron, 467 U.S. at 843 ("if the statute is 
silent or ambiguous with respect to the specific issue, the 
question for the court is whether the agency's answer is 

based on a permissible construction of the statute"), and 
arbitrary and capricious. See 42 U.S.C. s 7607(d)(9)(A). Ac-
cording to the Sierra Club, EPA has never explained why 
emission floors set through the MACT approach accurately 
estimate the performance of the relevant best performing 
plants: "The Agency provide[d] absolutely no reason to be-
lieve that an emission level that is achievable by every source 
that uses a particular control technology is necessarily a 
reasonable estimate of the actual performance of the best 
performing twelve percent of sources." Sierra Club Br. at 
23.

 We agree that to comply with the statute, EPA's method of 
setting emission floors must reasonably estimate the perfor-
mance of the relevant best performing plants. See 42 U.S.C. 
s 7412(d)(3); Sierra, 167 F.3d at 665. Yet the Sierra Club's 
brief does not explain why the emission standards EPA set 
might not accurately estimate the performance of the best 
performing twelve percent of plants. The brief never even 
suggests that the MACT approach in fact fails to predict the 
emission levels of the best performing sources. When we 
asked about this at oral argument, it became clear that the 
Sierra Club believes that EPA's MACT approach would not 
accurately estimate emission levels of the best performing 
twelve percent of plants if the best performing plants 
achieved their emission levels not just by using technology, 
but also by selecting cleaner manufacturing inputs. For 
example, the best performing twelve percent of plants might 
perform well because, in comparison to other plants having 
the same technology, they use less-polluting fuels or purer 
raw materials. Such plants would have predictably lower 
emissions than plants using MACT floor technology alone. 
Under such circumstances, the Sierra Club argues, because 
technology would represent only one of the factors determin-
ing emission levels of the best performing plants, EPA could 
not assume that emission levels from the worst-performing 
plant using MACT floor technology predict the performance 
of the best performing plants under the worst conditions.

 Although this argument may well have merit, the Sierra 
Club's failure to include the argument in its opening brief 

precludes us from considering it. See Corson & Gruman Co. 
v. NLRB, 899 F.2d 47, 50 n.4 (D.C. Cir. 1990). Claiming only 
that the Agency has "never explained" why the MACT ap-
proach accurately predicts the performance of the relevant 
best performing sources falls far short of alerting EPA to the 
argument we now understand the Sierra Club to be making, 
thus giving the Agency no opportunity to respond. The 
Sierra Club's failure is particularly serious because the 
MACT approach would accurately estimate the performance 
of the best performing sources of a particular HAP if pollu-
tion control technology were the only factor determining 
emission levels of that HAP--in other words, if emissions 
were unaffected by the use of either alternative fuels or raw 
materials. To be sure, as the Sierra Club points out in a 
letter submitted after oral argument pursuant to Rule 28(j) of 
our rules, it did raise its multiple control factors argument 
during the rulemaking in a comment regarding emission 
standards for mercury. Record comments, however, cannot 
cure a failure to raise a key argument here. We will there-
fore deny the Sierra Club's petition for review with respect to 
emission floors for PM and dioxin/furan.

B. Failure to set floors for HCl, mercury, and total hydro-
 carbons

 EPA established emission floors of "no control" for HCl, 
mercury, and total hydrocarbons (a surrogate for organic 
HAPs other than dioxin/furan) because the Agency found no 
cement plants using control technologies for these pollutants. 
The Sierra Club argues that EPA's failure to set emission 
limits for these HAPs violates the statute's requirement that 
the Agency establish emission standards for each of "the 
hazardous air pollutants listed for regulation." 42 U.S.C. 
s 7412(d)(1). Defending its decision, EPA points to Sierra's 
suggestion that the worst foreseeable performance of the best 
performing unit might be predictable from the performance 
of the worst performing unit using the same technology. See 
64 Fed. Reg. at 31,915 (citing Sierra, 167 F.3d at 665). 
According to EPA, if no control technology exists, then the 
worst foreseeable performance "could vary day by day" and 

the standard must be no control. See EPA Response to 
Comments (May 7, 1999), at 190.

 On this issue, we agree with the Sierra Club. Nothing in 
the statute even suggests that EPA may set emission levels 
only for those listed HAPs controlled with technology. To 
the contrary, the statute lists over one hundred specific 
HAPs, 42 U.S.C. s 7412(b)(1), and requires EPA to "promul-
gate regulations establishing emission standards for each 
category or subcategory of major sources ... of hazardous 
air pollutants listed for regulation." Id. s 7412(d)(1). The 
statute directs the Agency to promulgate these emission 
standards by November 15, 2000. Id. s 7412(e)(1)(E). Con-
gress added the list of pollutants to be regulated, regulation 
deadlines, and minimum stringency requirements to the 
Clean Air Act precisely because it believed EPA had failed to 
regulate enough HAPs under previous air toxics provisions. 
"The [air toxics] law has worked poorly. In 18 years, EPA 
has regulated only some sources of only seven chemicals.... 
The legislation reported by the Committee would entirely 
restructure the existing law, so that toxics might be adequate-
ly regulated by the Federal Government." S. Rep. No. 
101-228, at 128 (1989); see also H.R. Rep. No. 101-490, pt. 1, 
at 322 (1990) ("Since 1970, EPA has listed only eight sub-
stances as hazardous air pollutants ... and has promulgated 
emissions standards for seven of them.").

 Contrary to EPA's argument, nothing in Sierra relieves it 
of the clear statutory obligation to set emission standards for 
each listed HAP. Although Sierra permits the Agency to 
look at technological controls to set emission standards, see 
167 F.3d at 665, it does not say that EPA may avoid setting 
standards for HAPs not controlled with technology.

 Although we thus believe that section 7412(d)(1)'s language 
disposes of this issue, we add that our reading of that section 
is reinforced by 


the Clean Air Act's legislative history. A report by the Senate 
Committee on Environment and Public Works states:

 The technologies, practices or strategies which are to be 
 considered in setting emission standards under this sub-
 section go beyond the traditional end-of-the-stack treat-
 ment or abatement system. The Administrator is to give 
 priority to technologies or strategies which reduce the 
 amount of pollution generated through process changes 
 or the substitution of materials less hazardous. Pollution 
 prevention is to be the preferred strategy wherever 
 possible.
 
S. Rep. No. 101-228, at 168.

 For all of these reasons, the absence of technology-based 
pollution control devices for HCl, mercury, and total hydro-
carbons did not excuse EPA from setting emission standards 
for those pollutants. We thus will remand for EPA to do so.

C. Beyond-the-Floor Standards

 The Sierra Club presents a number of objections to EPA's 
refusal to set general beyond-the-floor emission standards for 
mercury, total hydrocarbons, and HAP metals (for which PM 
is a surrogate). Because EPA will now need to initiate new 
rulemaking proceedings to establish emission floors for mer-
cury and total hydrocarbons, we need not consider the Agen-
cy's refusal to set beyond-the-floor standards for those two 
HAPs. We address only the Sierra Club's challenge to the 
Agency's refusal to set beyond-the-floor standards for HAP 
metals.

 When determining whether to set beyond-the-floor stan-
dards, the Clean Air Act requires EPA to consider "the cost 

of achieving such emission reduction, and any non-air quality 
health and environmental impacts and energy requirements." 
42 U.S.C. s 7412(d)(2). The Sierra Club argues that EPA 
violated the statute by failing to consider the non-air quality 
health and environmental impacts of potential beyond-the-
floor standards for HAP metals. Again, we agree. Although 
EPA considered costs and energy requirements, nowhere in 
the record does it appear to have taken account of any non-air 
quality health effects.

 EPA's analysis of potential beyond-the-floor standards for 
HAP metals suffers from a second defect. As the Sierra 
Club points out, EPA, responding to a comment in the 
rulemaking suggesting that stricter emission standards for 
HAP metals could be achieved if cement kilns switched to 
natural gas, asserted that "[t]here are no data available to 
EPA that indicate that [fuel switching] can or has achieved 
metals emission reductions." 64 Fed. Reg 31,917. Yet a 
study in the record contains just such information, demon-
strating that switching to natural gas would in fact reduce 
metal emissions. See Office of Air Quality Planning and 
Standards, U.S. EPA, Study of Hazardous Air Pollutants 
Emissions from Electric Utility Steam Generating Units 
13-2 (1998). EPA now tells us that fuel switching is not a 
viable alternative because of inadequate supplies of natural 
gas. In support of this proposition, the Agency points to a 
handwritten notation on a report in the administrative record. 
But that note, supposedly written by an EPA employee, is 
virtually illegible--even the Agency's counsel was unable to 
decipher it at oral argument. Therefore, the note cannot 
supply a basis for EPA's decision. Although the Agency's 
brief cites one other study in support of its assertion that the 
supply of natural gas is inadequate, nothing in the rulemaking 
indicates that EPA relied on it. "[A]n agency's action must 
be upheld, if at all, on the basis articulated by the agency." 
Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 
463 U.S. 29, 50 (1983).

 Thus, because EPA failed to consider non-air quality health 
and environmental impacts of potential beyond-the-floor stan-
dards for HAP metals, and because it relied on a factually 

incorrect assertion in rejecting such standards, we will re-
mand the beyond-the-floor determination for HAP metals for 
further consideration consistent with this opinion. In view of 
the Sierra Club's request that we not vacate the EPA's 
regulations, because "to do so would at least temporarily 
defeat [Sierra Club's] purpose, the enhanced protection" of 
the environment, Environmental Defense Fund, Inc. v. 
Adm'r of the EPA, 898 F.2d 183, 190 (D.C. Cir. 1990), we will 
leave the current PM regulations in place during remand.

D. Monitoring

 In its final challenge, the Sierra Club argues that the 
regulation's monitoring requirements fail to provide reason-
able assurance of compliance with the emission standards. 
Specifically, it argues that the opacity monitoring required by 
the regulation will not guarantee compliance with the PM 
standard. EPA responds that opacity monitoring promotes 
good operation and maintenance, which in turn reasonably 
ensure compliance with the PM standard. Because the Sier-
ra Club has given us no basis for doubting this assertion, and 
because analysis of this issue "requires a high level of techni-
cal expertise, we must defer to the informed discretion" of the 
Agency. Marsh v. Oregon Natural Resources Council, 490 
U.S. 360, 377 (1989) (internal quotation marks omitted).

 III. Petition of the National Lime Association

 Petitioner National Lime Association (NLA) claims that 
two additional aspects of the portland cement rule are con-
trary to law and arbitrary and capricious: the EPA's use of 
PM as a surrogate for HAP metals, and its requirement that 
cement kilns use a specified technique to measure their HCl 
emissions under certain circumstances. We consider these 
arguments only after concluding that the NLA has standing 
to raise them.

A. Standing of the NLA

 The EPA argues that the NLA lacks standing to object to 
the portland cement rule because it is a trade association of 

lime and not of cement manufacturers. Although the EPA 
recognizes that some NLA members manufacture both ce-
ment and lime, the agency asserts that the NLA made no 
mention of its cement members during proceedings before 
the agency, "suggesting only that [the portland cement rule] 
could establish adverse precedents ... for the commercial 
lime industry." The EPA also emphasizes that NLA mem-
bers that manufacture both lime and cement are also mem-
bers of the American Portland Cement Association (APCA), 
which--in the view of the agency--adequately represents 
their cement interests. The APCA, as mentioned above, has 
intervened in this case in defense of the portland cement rule.

 The EPA cites no authority--and we know of none--
suggesting that the position taken by one association affects 
the right of another to seek judicial review; and although the 
possibility of an adverse precedent is clearly insufficient to 
establish the injury necessary for standing under Article III, 
an association anxious to avoid an adverse precedent may still 
bring a petition if it otherwise meets the requirements for 
standing. Those requirements are straightforward:

 [A]n association has standing to bring suit on behalf of its 
 members when: (a) its members would otherwise have 
 standing to sue in their own right; (b) the interests it 
 seeks to protect are germane to the organization's pur-
 pose; and (c) neither the claim asserted nor the relief 
 requested requires the participation of individual mem-
 bers in the lawsuit.
 
Hunt v. Washington State Apple Advertising Comm'n, 432 
U.S. 333, 343 (1977). That the NLA meets requirement (c) is 
unquestioned. In order to prevail on the standing question, 
then, the EPA must show that the NLA fails to meet 
requirement (a) or (b).

 Requirement (a) is met if "any one" of the association's 
members can "make out a justiciable case." Warth v. Seldin, 
422 U.S. 490, 511 (1975). The member must show (i) that it 
was injured in fact, (ii) that its injury was caused by the 
challenged rule, and (iii) that its injury would likely be 
redressed by a favorable decision of the court. Lujan v. 

Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). The NLA 
submits an affidavit from the "Environmental Director" of 
Blue Circle, Inc. affirming that Blue Circle is an NLA mem-
ber, stating that it operates both cement and lime manufac-
turing plants, and asserting facts indicating that it meets all 
three elements of requirement (a). Blue Circle asserts both 
that the use of PM as a surrogate and the HCl measurement 
requirement impose "significant" monitoring and compliance 
costs upon its cement operations, which would be avoided by 
this court's favorable decision. Blue Circle's specific asser-
tions as to harm, causation, and redressability are neither 
"general" nor "conclusory," as the EPA suggests. We con-
clude, therefore, that the NLA has at least one member that 
could assert a justiciable claim in its own right.

 Beyond injury in fact, causation, and redressability, re-
quirement (b) of Hunt demands that the interest an associa-
tion seeks to protect be "germane to the organization's pur-
pose." 432 U.S. at 343. This requirement of germaneness is 
"undemanding"; "mere pertinence between litigation subject 
and organizational purpose" is sufficient. Humane Soc'y v. 
Hodel, 840 F.2d 45, 58 (D.C. Cir. 1988). The subject of this 
litigation is the regulation of portland cement manufacturing; 
that is certainly "pertinent" to the NLA as a trade association 
of manufacturers of lime. Not only do some companies 
manufacture both cement and lime, but both industries share 
a critical raw material--limestone--and lime itself is some-
times used as an ingredient in portland cement. See 63 Fed. 
Reg. at 14,194/2; J.A.H. Oates, Lime and Limestone 81, 124 
(1998). The processes underlying the two types of manufac-
ture are also similar, as is made abundantly clear by the 
NLA's efforts to introduce into the record in this case data 
from the EPA's administrative record regarding the manufac-
ture of lime. Ct. Op. at 24-25 below. The two manufactur-
ing processes also emit some of the same pollutants. The 
regulation of portland cement thus falls well within the "spe-
cialized expertise and research resources" of the NLA. Hu-
mane Soc'y, 840 F.2d at 56.

 Our analysis of germaneness is unaffected by the EPA's 
argument that the NLA, in advancing its lime interests, has 

taken a position on the cement rule adverse to the interests of 
cement manufacturers. The NLA is entitled to be an advo-
cate for a subgroup of cement manufacturers whose interests 
diverge from those of the run of cement producers--for 
example, companies such as Blue Circle that manufacture 
both cement and lime. Cf. National Maritime Union v. 
Commander, Military Sealift Command, 824 F.2d 1228, 1234 
(D.C. Cir. 1987) (quoted in Humane Soc'y, 840 F.2d at 59 
n.25) ("mere fact of conflicting interests among members of 
an association does not of itself defeat the association's stand-
ing to urge the interests of some members in litigation, even 
though success may harm the legal interests of some mem-
bers").

 Because the NLA has at least one member that could have 
pressed the same claims in its own right, and because those 
claims are germane to the organizational purpose of the NLA, 
we conclude that the association has standing to petition for 
review of the portland cement rule.

B. The Use of PM as a Surrogate

 The NLA's primary objection to the portland cement rule 
is that it limits PM emissions from cement kilns instead of 
regulating emissions of HAP metals individually. The EPA 
justifies its decision to regulate PM as "a surrogate for non-
volatile HAP metals" by noting first that PM generated by 
cement kilns invariably contains HAP metals, so that prevent-
ing the emission of a unit of PM necessarily prevents the 
emission of some quantum of HAP metals. Using PM as a 
surrogate thus "achieves exactly the same level of HAP metal 
emissions limitation" as would be reached were the metals to 
be regulated directly. The agency also states that "the 
MACT floor equipment and level of control for HAP metals 
... is identical to that for PM." Finally, the agency notes 
that the use of a surrogate "eliminates the cost of perfor-
mance testing to comply with numerous standards for individ-
ual metals." 64 Fed. Reg. at 31,916/3.

 The EPA may use a surrogate to regulate hazardous 
pollutants if it is "reasonable" to do so. See Dithiocarbamate 
Task Force v. EPA, 98 F.3d 1394, 1399 (D.C. Cir. 1996) (EPA 

may attribute characteristics of a subclass of substances to an 
entire class of substances if doing so is scientifically reason-
able); NRDC v. EPA, 822 F.2d 104, 125 (D.C. Cir. 1987) 
(EPA may regulate pollutant indirectly when its emissions 
are controllable by regulation of other pollutants). Even a 
reasonable surrogate, of course, may not be used where doing 
so would be otherwise contrary to law. The NLA does not 
challenge the legality of surrogacy in general, but does main-
tain that in this case the use of PM as a surrogate is both 
contrary to law and unreasonable.

1. Legality of using a criteria pollutant as a surrogate

 The NLA argues first that the EPA may not use PM as a 
surrogate for HAP metals because PM is a criteria pollu-
tant--one of several ubiquitous pollutants that the EPA 
regulates by establishing national ambient air quality stan-
dards (NAAQS) under ss 108-09 of the Clean Air Act. 42 
U.S.C. ss 7408-09. The provision authorizing the EPA to 
regulate HAPs in the Clean Air Act is limited by the qualifi-
cation that "no [criteria] air pollutant ... may be added to 
the list [of regulable HAPs]." Id. s 7412(b)(2). The NLA 
argues that although surrogates for HAPs are permissible in 
general, using a criteria pollutant as such a surrogate has the 
effect of regulating that pollutant as a HAP "through the 
back door" and thus illicitly supplementing (or even supplant-
ing) the NAAQS applicable to that pollutant.

 The EPA suggests first that the NLA's interpretation is 
inconsistent with the stated expectation of the Congress that 
HAP metals might be regulated under the Clean Air Act by 
way of a PM surrogate, but the agency's point is not well-
taken. The EPA relies principally upon a report accompany-
ing Senate Bill 1630, a version of which would ultimately 
become the Clean Air Act Amendments of 1990. The report, 
in a discussion of the EPA's discretionary authority to lower 
the level of emissions that qualifies a facility as a "major 
source" of HAPs, see 42 U.S.C. s 7412(a)(1), notes that the 
agency may find this power "especially useful in the control of 
particulate emissions including metals for some source cate-
gories." S. Rep. No. 101-228, at 151. The authors of the 

report thus appear to have contemplated that the regulation 
of "metals" could be subsumed by controls placed upon 
"particulate emissions."

 The report, however, was issued in conjunction with Senate 
Bill 1630 as it went to the floor of the Senate on December 20, 
1989. In that version of the bill, the passage that would have 
become s 7412(b)(2) authorized the Administrator to add to 
the list of hazardous air pollutants any additional pollutants

 which present, or may present, ... a threat of adverse 
 human health effects (including, but not limited to, sub-
 stances which are known to be, ... carcinogenic [etc.,] 
 but not including effects for which a pollutant has been 
 listed pursuant to section 108 of [the Clean Air] Act).
 
S. 1630, 101st Cong. s 301, at 324 (1989) (emphasis added). 
The italicized clause in the reported version of Senate Bill 
1630 does not appear in the statute as enacted. The sentence 
that appears in the legislation that the Congress ultimately 
passed, and upon which the NLA bases its statutory claim, 
provides: "No air pollutant which is listed under section 
7408(a) of this title [i.e., s 108 of the Clean Air Act,] may be 
added to the list [of HAPs] under this section." 42 U.S.C. 
s 7412(b)(2).

 The italicized clause in the unenacted bill is materially 
different from the statutory provision upon which the NLA 
bases its claim. The earlier version would have prohibited 
the regulation of a criteria pollutant as a HAP only if such 
regulation was based upon the same reason for which the 
pollutant was listed as a criteria pollutant under s 108. The 
final statute, by contrast, unqualifiedly prohibits listing a 
criteria pollutant as a HAP, that is, regardless of the reason. 
Because the comment in the Senate Report regarding PM 
and metals was made before the blanket prohibition upon 
regulating PM as a HAP was added to the statute, the report 
is irrelevant to our construction of s 7412(b)(2) as enacted.

 The enacted statute, to which we now turn, prohibits the 
addition of any criteria pollutant to "the list" of HAPs, with a 
single exception for certain precursor pollutants not relevant 

to this case. See id. This prohibition extends of necessity 
not only to rules that literally list a criteria pollutant as a 
HAP but also to any rule that in effect treats a criteria 
pollutant as a HAP. As the EPA shows, however, the 
portland cement rule does not treat PM as a HAP generally; 
it regulates only PM that is emitted from cement kilns. The 
rule does not treat PM, unlike a HAP metal, as a pollutant 
the emissions of which determine whether a cement plant is a 
"major source" of emissions. See id. s 7412(a)(1). Nor does 
the EPA suggest in any way that it contemplates broad 
regulation of PM pursuant to s 7412. To the contrary, all of 
the evidence upon which the agency relies to justify its use of 
PM as a surrogate is particular to the cement industry. See 
Memorandum from Elizabeth Heath, Research Triangle In-
stitute, to Joseph Wood, EPA 2-8 (Feb. 21, 1996); Memoran-
dum from Michael Benson, Research Triangle Institute, to 
Mary Johnson, EPA 1 (June 21, 1993); Portland Cement 
Ass'n, An Analysis of Selected Trace Metals in Cement and 
Kiln Dust at 3-4 (1992). We therefore conclude that the use 
of PM as a surrogate for HAP metals is not contrary to law.

2. Reasonableness of the PM surrogate

 The NLA also contends that PM is an unreasonable surro-
gate for HAP metals because HAP metals make up a "very 
small and variable" portion of cement kiln PM emissions. 
The NLA faults the EPA both because it did not demonstrate 
and quantify a consistent correlation between PM stack emis-
sions and their HAP metal content, and because it selected a 
surrogate of which HAP metals make up only "about one 
tenth of one percent."

 The EPA acknowledges both points. The closest the agen-
cy comes to making a numerical estimate of the correlation 
between PM and the HAP metals it contains is the statement 
that "the total average HAP metal content of kiln exhaust 
PM is approximately one weight percent." 63 Fed. Reg. at 
14,195/2. The EPA thus admits that the ratio of HAP metals 
to total particulates is small; and the agency nowhere dis-
cusses the variance associated with its estimated average. 
The EPA contends, however, that it justified the surrogacy 

adequately by demonstrating that "where there is cement kiln 
PM, HAP metals are always in it, and when cement kiln PM 
is removed from emissions, HAP metals are always removed 
with it." According to the EPA, as long as it demonstrates 
that there is a correlation between HAP metals and PM, it 
need not quantify that correlation or assess its variability 
because PM control technology is such that each unit of PM 
emissions avoided "carries" within it some quantum of HAP 
metals.

 The agency's analysis is not unreasonable. If HAP metals 
are invariably present in cement kiln PM, then even if the 
ratio of metals to PM is small and variable, or simply 
unknown, PM is a reasonable surrogate for the metals--
assuming, as both the EPA and the NLA appear to do, that 
PM control technology indiscriminately captures HAP metals 
along with other particulates, an assumption about which we 
say more in the next paragraph. The EPA is under no 
obligation to achieve a particular numerical reduction in HAP 
metal emissions; it must reduce their emission only to the 
level "achieved" by the best performing facility or, for exist-
ing sources, to the level achieved by the median of the best-
performing 12 percent of facilities. 42 U.S.C. s 7412(d)(3). 
If PM control is the only means by which facilities "achieve" 
reductions in HAP metal emissions, then the EPA may 
require PM control without quantifying the reduction in HAP 
metals thus achieved.

 We should add, however, that the EPA may need to 
reconsider whether PM is an appropriate surrogate for HAP 
metals when, upon remand, it considers whether to establish 
beyond-the-floor standards for HAP metals (for which PM is 
a proxy). We held above, see Ct. Op. at 14, that the EPA 
must consider the potential impact upon emissions of changes 
in inputs to the cement manufacturing process, especially the 
possibility of fuel switching. The EPA decided to use PM as 
a surrogate for HAP metals because PM control technology 
traps HAP metal particles and other particulates indiscrimi-
nately. In considering the role of inputs, the EPA must also 
assure itself that fuels and other inputs affect HAP metal 
emissions in the same fashion that they affect the other 
components of PM. For example, PM might not be an 

appropriate surrogate for HAP metals if switching fuels 
would decrease HAP metal emissions without causing a corre-
sponding reduction in total PM emissions.

3. The NLA's other arguments against PM as a surrogate

 The NLA offers several other reasons for thinking the 
EPA's use of PM as a surrogate for HAP metals might be 
unreasonable or contrary to law, but each of them is without 
merit. First, the NLA claims that the use of PM as a 
surrogate is incompatible with the agency's own methodology 
for setting MACT floors. According to the NLA, this meth-
odology requires the agency to set a floor of "no control" for 
HAP metals because no cement plant intentionally controls 
HAP metals; metal emissions are controlled only incidentally 
by controls placed upon PM. The EPA's response is the 
correct one: "cement plants actually are controlling HAP 
metals[,] [i]ntentionally or not." The Clean Air Act requires 
the EPA to set MACT floors based upon the "average 
emission limitation[s] achieved," 42 U.S.C. s 7412(d)(3); it 
nowhere suggests that this achievement must be the product 
of a specific intent. Moreover, as we have seen, the EPA's 
floor-setting methodology does not permit the agency to set a 
MACT floor of "no control" simply because no controls are in 
place, see Ct. Op. at 12 above; a fortiori, the EPA may not 
set such a floor when the controls are in place but the cement 
kilns have not intentionally deployed them for that purpose.

 Second, the NLA claims that the EPA, in limiting PM 
emissions, failed to meet the statutory requirement to "tak[e] 
into consideration the cost of achieving ... emissions reduc-
tion[s]" for the underlying HAP metals. 42 U.S.C. 
s 7412(d)(2). According to the NLA, the per unit cost of 
preventing HAP metal emissions is prohibitively high. Cost, 
however, may be taken into account only in considering 
beyond-the-floor emissions limitations, which in the case of 
PM we have remanded to the agency; cost may not influence 
the determination of a MACT floor, which depends exclusive-
ly upon the emissions reductions achieved by the best-
performing sources. See id. s 7412(d)(3). Relatedly, the 
NLA also claims that in light of both the high costs and the 
low quantities of HAP metals to be controlled, the EPA 

should read a de minimis exception into the requirement that 
it regulate all hazardous air pollutants emitted by major 
sources. The EPA reasonably rejected this argument on the 
ground that the statute "does not provide for exceptions from 
emissions standards based on de minimis principles where a 
MACT floor exists." Response to Comments at 211.

C. Measurement of HCl Emissions

 HCl is emitted in sufficient quantity from most cement 
kilns to qualify each kiln as a "major source," that is, a source 
that "emits or has the potential to emit considering controls, 
in the aggregate, 10 tons per year or more of any [HAP]," 42 
U.S.C. s 7412 (a)(1). See 63 Fed. Reg. at 14,192-93. The 
challenged rule allows a single technique for measuring HCl 
emissions from a cement kiln--Fourier Transform Infrared 
Spectroscopy (FTIR)-if the kiln "wishes to claim it is not a 
major source." 64 Fed. Reg. at 31,907/2. The EPA refused 
to allow kilns to use two other methods--so-called Method 26 
and its variant, Method 26A--to support such a claim be-
cause, in the agency's view, these methods "may underesti-
mate HCl emissions by a factor of 2 to 25." 63 Fed. Reg. at 
14,193/1. The NLA claims that this determination was un-
lawful and arbitrary and capricious. It also asserts that the 
EPA acted unlawfully when it refused to consider NLA's 
comments suggesting potential improvements in Method 
26/26A.

 The NLA bases its claim upon data regarding Method 
26/26A that it submitted to the EPA but the agency did not 
consider. The EPA was under no obligation to do so, howev-
er, because the materials the NLA cites were not part of the 
administrative record. All but one of the letters from the 
NLA transmitting the disputed information to the EPA are 
dated after June 26, 1998, the close of the comment period. 
64 Fed. Reg. at 31,900/1. Information submitted to the 
agency out of time is incorporated into the administrative 
record only if the Administrator of the EPA determines that 
it is "of central relevance to the rulemaking." 42 U.S.C. 
s 7607(d)(4)(B)(i). Because she did not so determine, the 
NLA may not present arguments based upon that informa-
tion.

 The one document the NLA proffers that was submitted 
within the comment period is a letter dated June 22, 1998, 
transmitting a summary of a conference call that day between 
officials of the NLA and of the EPA. See Letter from Arlene 
Seeger, Executive Director, NLA, to Joseph P. Wood, EPA 1. 
The June 22 letter nowhere suggests, however, that it is 
being submitted in connection with the proposed portland 
cement rule. Instead, as is also implied in later correspon-
dence between the EPA and the NLA, the conference call 
appears to have been part of an ongoing dialogue between the 
agency and the NLA regarding a proposed rule affecting the 
lime industry. The EPA is not required to consider in its 
deliberations here information apparently submitted in con-
nection with a different rulemaking proceeding when no one 
timely asked it to do so.

 The NLA also suggests that the EPA unlawfully failed to 
consider several pages of handwritten calculations that pur-
port to test whether another approach to measuring HCl 
emissions--gas filter correlation infrared spectroscopy 
(GFCIR)--generates biased results relative to FTIR. The 
EPA concedes that this test should have been, but was not, 
included in the administrative record. As the EPA points 
out, however, the omission is immaterial because the agency 
used the calculations only to determine that GFCIR was too 
biased to be a usable testing method--and the NLA does not 
challenge that determination. We therefore conclude that the 
EPA was not required to consider the data the NLA cites in 
deciding that Method 26/26A could not be used to challenge 
"major source" determinations.

 Separately, the EPA concedes that it failed to consider the 
NLA's properly submitted comments regarding possible im-
provements to Method 26/26A. We therefore remand this 
matter to the agency so that it may respond to those com-
ments.

 IV. Conclusion

 In summary, we remand the rule to the EPA to allow the 
agency to (1) set "MACT floor" standards for HCl, mercury, 

and total hydrocarbons; (2) consider setting "beyond-the-
floor" standards for HAP metals; and (3) respond to com-
ments suggesting improvements to Method 26/26A for meas-
uring HCl emissions. With respect to all other issues dis-
cussed herein, the petitions are denied.

 So ordered.